and we will conference with her after she has had a chance to hear them. So we will not be able to give anybody any decisions today, but we'll do the best we can. Okay, the first case for today is – oh, and I do want to express my appreciation to all the council who are here. I know that it's not easy for you to get here. I live close by and it was not easy for me to get here, but I had the assistance of the one court personnel upon whom we can depend, and that's William Bradley, who is sitting here listening, learning the law. And he came and got me. Frankly, the marshals aren't even here. So we'll hear council in EEOCv.GEOGrp. May it please the Court. My name is Elizabeth Theron and I represent the EEOC. I would like to reserve five minutes for rebuttal. Thank you. Your Honors, the Commission does not dispute, and has never disputed, that safety and security are extremely important concerns in all workplaces and especially in prisons. In fact, if the defendant in this case had been able to establish factually that accommodating the religious needs of the class members to wear their kimars in public would truly place anyone's safety or security in jeopardy or would otherwise unduly burden its business operations, we would not be here in federal court. The reason we're standing here today is that Title VII gives employees the right to adhere to their religious beliefs in the workplace without discrimination, which is exactly what the three class members here had been doing prior to October 2005 without any problem whatsoever, unless the employer can show that accommodating those beliefs would be unduly burdensome on the conduct of its business. Because a reasonable jury could find that the defendant had available to it any number of de minimis options by which it could have allowed the class members to continue wearing their kimars while remaining employed at GWHCF. What about, though, you know the, I forgot his name now, but the affidavit of one of the officials of the defendant seems to counter all of the accommodations that's put forward by the camp report, right? I think you're referring to Deputy Warden Holmes' affirmation? Probably. Holmes' affirmation, Your Honor, doesn't even really come close to meeting the burden of, remember, undue burdensomeness is, it's an affirmative defense that has to be proven by the defendant, and this is summary judgment. So the standard here is that they have to show that no reasonable jury could find, a reasonable jury would be compelled to find that there's no genuine dispute of material fact on this point. Well, I mean, for instance, what is, what's your, like, say, best case for a reasonable accommodation that's not unduly burdensome? There is a case that we actually, that's cited in the EEOC's guidance. It's not a decision. It's a settlement that was actually reached between the United States and the New York State Department of Correctional Services. This is at footnote 165 in our guidance. It's United States versus New York State Department of Correctional Services, Civil Action Number 072243. Did you cite that in your brief? Yes, we cited to this footnote in our brief. And it's a settlement where the New York State Department of Correctional Services agreed to allow Muslim correctional officers to wear kufis. Wear what? Kufis, which are a skull, it's a large skull cap, larger than a yarmulke. It's a skull cap that goes around the head. How is that different from a hairpiece? It's not a hairpiece, Your Honor. It's actually a cloth skull cap that comes down over the head. Well, that isn't a kimar. It doesn't have the same opportunity to hide a contraband in it that a kimar has, does it? Well, respectfully, Your Honor, it does. I mean, any cloth piece that comes over the head, remember what Holm testifies. Well, it doesn't go over the forehead and come down over the ears like a kimar does. Well, again, though, remember, Your Honor, what Holm is testifying about as the contraband in question that he's concerned about are small amounts of drugs, razor blades. These are very small objects. We're not talking about nuclear weapons here. So you could just as easily – Well, we understand that. But it's easier to secrete a razor blade in a kimar than it would be in a kufi or a yarmulke. Well, respectfully, Your Honor, Camp, who was an expert in these matters, the Camp expert report, which we introduced in district court and which the – Which didn't persuade the district judge. Well, no, it didn't. But, you know, again, that's a factual matter that a jury should have been allowed to determine. Again, the standard here is whether there's a genuine dispute of material fact. And Camp, whose expertise in these matters was unchallenged by the defendants in district court, he concluded that there was no reason to think – because, remember, the class members had stated that they agreed to remove their kimars to be searched as they entered the prison, exited the prison. Well, that's certainly a burdensome procedure according to the information that's in the – they have to be searched each time you pass through a door. I think the record shows 16 times. Again, Your Honor, that – doesn't really accommodate that, does it? Actually, it not only does it, Your Honor, but that statement really is lacking a lot of factual foundation on Holmes' part. For example, he assumes in making that statement that each class member would go through, as a factual matter, all 16 doors every single day. Well, certainly some. Well, actually, no, Your Honor. We don't know that at all. Again, remember, the defendant has the burden to show undue hardship. This is entirely their burden. It's an affirmative defense. Carmen Sharp-Allen is a nurse who works exclusively in the infirmary. King works behind an intake desk all day long. Only Moss is a correctional officer, and the defendant made no showing at all about what their daily routines are and whether they go through these doors at all on a daily basis. We don't know, and the defendant had the burden to show that. That's really – you know, this Court's decision in Protos, I think, makes this point really clearly. What about this Court's decision in Webb? I'd be happy to talk about this Court's decision in Webb. Isn't that what we have to look to? I mean, isn't that the closest case possible? It is a close case, but again – Why isn't it the closest case? It is – I will be happy to say that it's the closest case, but – Don't say it to please me. Say it if it's so, if you think it's so. I think there are really fundamental and critical differences between the rationale that this Court embraced in Webb that are different from this case, and I think the district court really just paid no attention to that in rendering the decision that it did. For one thing, prison employees don't have any law enforcement authority outside their workplace. So if you look at the rationale that underlay Webb – But it's the workplace we're talking about, isn't it? Right, exactly. But you have to look at the rationale that this Court really espoused in Webb, and Webb stands on a foundation that is built on the notion of public policing and the relationship between the public and the police force. I encourage you to really look closely at Webb because this is exactly what this Court said. I can assure you that the Court will look closely at its own case. I didn't mean to suggest otherwise, Your Honor. I'm sorry. I've spent a lot of close time with Webb. And what this Court said in Webb was that there's this ultra-compelling need for strict uniformity because in the public context, police officers must be two things. They must be readily identifiable, so there can be no question when you're out in public who is a police officer and who isn't. And second, they must be strictly, strictly neutral because the public can have no doubt as to whether the police are on their side or not. They must feel absolutely free to go to a police officer at any time and feel that the police will be on their side. You don't think it's important for prison officials to give the prisoners the view that they are neutral? You don't think it's as important in a prison context as in the outside context? Your Honor, it's not that we don't think that that's important. The defendant did not raise that concern here as a factual matter. Again, I walked through the prison less than a year ago. I don't know how often you've been to a prison. I've been to prisons, Your Honor. Yeah, well, I was within the last year. And prisons are not playgrounds. Absolutely. And even though this prison is not a heavy security prison, you don't know what prisoners will do. So I don't understand why it's not as important to give the impression of neutrality in a prison where a lot of the prisoners are Muslim and some are not Muslim. And the idea of having prison officials walking around with Muslim garb may not give the impression of neutrality. And, Your Honor, we don't disagree with that. That's not at all our point. It isn't that it isn't important. It's that the prison wardens didn't say that it was important. That's not a justification that they raised here. Nardolillo and Holm were asked over and over again, what are your reasons for this policy? They had multiple opportunities to give that as a justification. In fact, if they had given that as a justification, arguably we might not be here. But that isn't the justification that they gave. And all we have is the record before us to go on. So, you know. What were their rationales? They had three rationales. The primary rationale they gave was security to do with smuggling contraband inside a kimar, which, again, Camp spoke to when he said that there's not much you could smuggle in a kimar that you couldn't smuggle in anything else. Safety, when they said that a kimar could be used against a prison employee by an inmate. And, again, the Camp report spoke to that as well. And then, sort of as a side note, they mentioned uniformity of appearance, but not in the same way that they did in Webb. I see that my time is about to run out. Can I finish answering the question? Certainly. And you have a long rebuttal. Right. And the third rationale that they gave was uniformity of appearance, but the testimony on that was not what it was in Webb. What they said about uniformity of appearance was it doesn't look well for people to be wearing New York Yankees baseball caps and other nonstandard headgear in the prison. Okay. Thank you. Sure. Good morning, Your Honors. May it please the Court. My name is Walter Kowalik. I'm here for the Geo Group. Oh. But, essentially, it would be the same position that the government would have. Is that right? I mean, you're ‑‑ Are you making the comparison? The position is it's a surrogate for the government prison officials. Is that right? I don't believe so. Because we're working under the law we are. All we have to show is that there will be ‑‑ We have to get you on the tape. Go ahead. Is it more than the minimum cost? You have to talk a little louder. Oh, I apologize, Your Honor. Basically, all we have to show here is that there will be non‑due hardship. Basically, we have to show that any accommodation would be more than at the minimum cost. And here, the record clearly shows that there are at least three rationales for this policy. There was the safety, the prevention of contraband, as well as the uniformity concern. I want to make two points clear here. Number one, when we talk about the camp report and it talks about contraband, he admits in the camp report, yeah, there could be smuggling. Greg, are you getting this? Is he talking clearly enough for you? Okay. You know, in your papers, the point your opponent made, you make no attempt to distinguish between correctional officers and what I'll call the non‑uniformed personnel who don't even go into the secured areas. Well, because I think ‑‑ Let me finish my question. I'm sorry. Why should the same, you know, no headwear policy apply to, you know, somebody who doesn't go into the secured area? When we talk about uniformity ‑‑ Is there a safety reason? I'm sorry? Is there a safety reason for that? There are safety reasons. Basically, all of these plaintiffs do come in contact with prison inmates and they're all within the secure boundary of the prison. It isn't as if they're ‑‑ I thought the nurse works mostly outside the secure ‑‑ She works in the infirmary, which is within the secure perimeter. Within the prison, but it's not within the, you know, where the, what do you call it, Well, from my understanding is that part of her job would take her in contact with the prisoners. Now, I don't think it was very clear to me at least whether it was, whether at any point she actually wanted to say, for example, cell blocks, as opposed to having the prisoners move to an infirmary. But nevertheless, it's all within the secure perimeter. And that's the point, because breaching the secure perimeter is where the contraband interest, for example, that's key. Because once you're inside the secure perimeter, there is ‑‑ Have contraband been a problem at that prison? I'm sorry? Have contraband been a problem at that prison? They are having ‑‑ You went for years with a, you know, without a no headgear policy, right? Was contraband a problem at that time? There have been problems with contraband, yes. And were they smuggling headgear? There's no point on the record where they indicate headgear as the mechanism. All right. So for many, many, as I gather, four or five years, you know, there was not a no headgear policy, right? From my understanding that it was, right, that it was when GEO Group came and took over the prison, they implemented the no headgear policy at a certain point. What happened that the no headgear policy was implemented when GEO took over? That's my understanding, yeah. At a point, I'm not sure ‑‑ I didn't understand that from the brief. What is not certain to me, because honestly I didn't think it would be an issue, as at what point in their tenure as ‑‑ My impression was that even after GEO took over and the same warden was there, you know, they didn't enforce a no headgear policy. No, no, it was ‑‑ For several years. It was further enforced when the deputy warden came on, and as part of basically what he wanted to do was because they were having ‑‑ My question is, during that period when the no headgear policy was not being enforced, was there a smuggling problem with headgear? Well, there was a specific problem with headgear, but what he did here was he implemented a number of different changes in order to prevent this contraband issue, and I think it's an important point because even the expert, Mr. Kemp, suggested in his report that this is a legitimate thing, that they can smuggle contraband using ‑‑ Well, no one can say it's not legitimate. The question is, you know, I mean, you know, how costly would an accommodation be? Well, it's more than de minimis cost is what we would suggest. Why is that? Well, because, you know, once you say, okay, well, we can have the Khmers come in. If we want to maintain the level of security against contraband that the band establishes, then we would have to implement all these additional security measures, as, for example, you know, there's 16 different secure places within the prison. At each point, if any of ‑‑ Well, it doesn't make sense to me that at each point when, you know, the few employees who would wear this headgear go into the secured gates that another employee would have to go in and take the scarf. You could see the person with it, right? My understanding is you can get a full view of the person on the video, can't you? The testimony of the deputy warden is that you can't because it isn't ‑‑ because it's against the face, it can throw shadows, and, you know, and that would obscure identification. You didn't put in a photograph of a Khmer in the record, right? I'm sorry? You didn't put in any photograph in the record. I don't believe there is in the record. That's right. You didn't put that in. No. We had to get it off the Internet, but it might not be the same. I want to go back to an answer that you gave to Judge Tashima. Judge Tashima asked you if there had been a problem with contraband in this prison. I don't think I understood your answer, or I didn't hear it. What is your answer, yes or no? Yes, there had been problems, and they were trying to address those issues. Did you put those on the record? There is evidence on the record of that there had been problems. Where? Would you tell us where in the appendix there is evidence that there was a problem with contraband in this prison? It was, I believe, the deputy warden's testimony. He testified to it. If Your Honor would permit, I'd be happy to supplement with a short. I think so, because I think the EEOC brief said that there was no evidence in the record of any contraband in this prison. And I'd like to know who's right. I mean, either there was or there wasn't. This is a factual matter, so we can find that out. One of the things I would like to state, though, is that in Mr. Camp's report, what he attempted to argue was essentially that that GEO group was essentially saying that we were having a problem with contraband through headgear and that we implemented this program specifically towards that. That wasn't my question. I asked a very specific question. Right. My question was, was there anything in this record, because I pick up Judge Tashima's question, was there anything in this record to show that there had been a problem with contraband in this prison, and you said yes. Yes. And I asked you where it appears. Correct. And you say it's in the testimony. Right. So we will double-check the testimony. That is my understanding. But to confirm what you said to me earlier, there may be evidence of a problem with contraband, but there is no case where contraband was smuggled in in headgear, is there? Not yet. And Mr. Camp's report makes clear that it's clearly possible. We have a situation where contraband was smuggled in through a jacket pocket and a sock. Do you say they can't wear socks? No. No. And here's the difference between a sock and a headgear, is that socks is pretty much a necessity. It's not as if it's an additional thing. Well, a necessity depends on whose point of view. A Muslim woman, it's necessary, isn't it, to wear headgear? It's necessary. There is a penological justification. Not to wear it would be like what a Catholic would call a mortal sin, isn't it? Doesn't that make it necessary? I couldn't make that theological assessment. Well, that's the problem. We shouldn't try to make those judgments. But what I'm saying is that there's a penological justification for having people wear socks that wouldn't necessarily be true with the Kimor. If, for example, we were talking about a long-flowing cape, for example. Well, you can't come up with any penological justification for it. So the prison first has to think, what is my concerns regarding safety? What is my concerns regarding contraband? What is my justifications? What are my thoughts regarding uniformity? And then would then say, since there's no penological justification for it, then at that point anything more, any accommodations more, would be more than a de minimis cost in security and uniformity. You didn't rely. I just checked your brief. I can understand you didn't rely on Webb in your brief because Webb probably came out. No, Webb did come out before you wrote your brief. Why didn't you? I did address Webb in my brief. Then I. And basically. Go ahead. With regard to Webb, I would say that the key points there are the fact that the court recognized that safety and uniformity, the importance of it, are sufficient to find that any complete exception to the policy was an undue hardship. I'm sorry. You certainly did rely on Webb. The EEOC tries to make the distinction between the police context and the prison context, and there are factual differences, I mean, just simply by the fact that there are. But the principle that was applied in Webb, I think, applies directly here. The same uniformity principle is the same. The facts are different. Go ahead. No, no. But the reason that justifies or compels that for a police department is not as strong, I think it's probably there, but not as strong, you know, in your case, because, one, it's a prison. You're dealing only with people behind bars, and they certainly know who's in authority. And, two, you're a private corporation. I mean, you know, the extent to which a private corporation can exercise police powers, I think, has to be somewhat limited. I mean, you can't have a private corporation take over Philadelphia Police Department. Do you think you can do that? Correct, but I would even – I don't think so. See, so, you know, I mean, you can't take this police power analogy too far. No, I wouldn't take it too far, but what I would say is that it is equally applicable here, and especially since – Well, okay. It's hard for me to accept that it's equally. It's at least – Well, you see, here's the main problem I have with applying Webb to your case, and you can tell me, you know, why maybe this reasoning is not correct, is that Webb was decided mostly on the testimony or the affidavit of the police commissioner. Correct. Which was uncontradicted. In this case, you have the Camp report, and all of the, you know, issues that you raise or that your client raises as to why it's, you know, necessary to have this too, why it's not de minimis, it's controverted by the Camp report. I mean, these are all controverted issues of fact, so it doesn't seem to me to be right for summary judgment. Here's where I would disagree, because if you actually look at what Mr. Camp says, and I detail this at length in my brief, is that he makes arguments, but they're not supported by the facts. The perfect example, as I talked about before, he talks about – Well, he's got a lot of charts in his report. He talks in his report about why we implemented this policy and that had a direct one-on-one relationship to smuggling in the headgear, and therefore, since we couldn't show a decline after the policy, that therefore there had to be some sort of pretext involved. But the fact of the matter is that he was absolutely wrong on his initial presumption. We didn't do this because we had a specific problem. We did this – we being GeoGroup, of course – did this because it was a proactive move. They were seeking to address this problem, and this was one clearly, easily foreseeable problem that they wanted to take care of. Why didn't you – again, unless it wasn't so – I mean, you do cite Webb frequently, but the EEOC says that you never argue that one of your reasons for your no-headgear policy was to maintain the appearance of neutrality, which is one of the principal – Correct. I think that that – Why didn't – I mean, was that a reason? Well, I think that it's a fair view of what the uniformity interest is, because when you're talking of – But you didn't specifically say it. It wasn't specifically addressed – Although you cite Webb, I think, about 10 times. Right. It wasn't specifically addressed in those particular terms. But I believe that if you read the testimony of the wardens in context, you will see that one of the things they're talking about is the penological justifications for a uniform policy, and I think that that's just the simply one – the next step is that showing. Anything else you'd like to tell us? I have nothing further. Oh, no. Okay, thank you. Thank you. We'll hear from the EEOC. All right. Can we decide this case and be true to our precedent in Webb? After all, that opinion was written by the current chief judge of the circuit and two other actors. So they thought a lot about that opinion. You can decide this case very easily in our favor and be completely true to Webb on two bases. One, as Judge Tashima pointed out, the Webb court reiterated several times that Webb did not challenge Commissioner Johnson's rationale at any point during the proceedings in that case. In this case, the EEOC has vigorously challenged GEO's rationale through that Webb – through the camp expert report. But on the other hand, you know, you heard Mr. Kowalik. He said, well, you know, what the camp report is is just a bunch of conclusions and opinions, but it's not backed up by any facts. With respect, that characterization is completely inaccurate. He took one point out of the camp expert report and tries to hang an entire characterization off that one point. Camp lists in the appendix to his expert report all of the prison's own data that he relied on in coming to the conclusions that he did. And the defendant just took one conclusion and said, okay, you have to throw out the entire baby with the bathwater. He undertook an analysis, and what he found was – and this actually goes to Judge Sloviter's point before where you were asking whether or not there is a contraband problem at this prison. The EEOC, we never said there wasn't a contraband problem at this prison. And isn't the issue whether there could be a contraband? We just had a case – I don't remember if he killed the other guy or not – in which some prisoner took dental – something from dental tape or something from a dental thing and caused a very serious danger. I can't remember whether – may have been killed the other prisoner in the cell with him. And it doesn't take very much to hide a little bit of that dental stuff. Sure. Well, so, okay, the position that we took wasn't that there wasn't a problem. The position that we took was that there was little to no problem with employee smuggling of contraband and that GEO, out of all of the incidents with employee smuggling, had only been able to identify two. One, the employee with it in the jacket pocket, and the other with it in the sock. But doesn't a prison – doesn't a prison have the right to be proactive? Yes. To say, look, even if it never happened before, we want to be safe. We want to have not only our prisoners safe and our other staff people safe. Why isn't – there's a lot of money in – take drugs. There's a lot of money in drugs. And underpaid prison officials may have a lot of temptations to smuggle in cocaine. And I gather cocaine doesn't show much. Marijuana – we have a case on marijuana later today. That's bigger, I gather. Right. But cocaine is small. Right. Employers do have a right to be proactive, and prisons have a right to be proactive. But the question, again, with Title VII confers this right unless an employer can show undue hardship. And when you look at this, the question always becomes, how realistic is the likelihood of this incident? That's what you have to unpack. Well, take the one employee – excuse me – take the one employee who is a guard. Right. I mean, leave aside the one who's in the infirmary and the intake person. But one of the employees – and this applies also to other possible female guards – they have to go in and out and through the prison throughout the day. Right. So why isn't the prison correct in saying it would be an undue hardship to make her take off the camera every time she goes through one of these 16 gates? Because as Camp, the expert, testified, she's willing to take it off. And if she takes it off to go through the same recognition system that everybody else goes through, she is no different from anybody else. And who's the other anybody else? The men are not wearing anything that they have to take off. If she goes through a video camera holding it in her hand for identification purposes – Why does somebody have to look at it to see what's inside it? Well, you know, here's an interesting point. In that home affirmation – Is there a yes or a no to that? She has to take it off, but they're not – first of all, no. I mean, there is no difference. If she's walking through holding a piece of cloth and this is purely for identification of her face, then no, it is no different than a man walking through with his hands in his pockets or anything like that. Why is it – I don't – maybe I don't understand. Because it's just looking at her face, Your Honor. Excuse me. I'm sorry. But why isn't it also an issue of whether when she's walking through there's some cocaine in the camera? Because if you're talking about the internal checkpoints, Your Honor – I'm talking about – Those are just video recognition. All they're doing is looking at your face. They're not searching you. At least prior to Holm, they were not searching you. What I was going to say was the interesting thing is in Holm's affirmation, if you reread his affirmation, he says that when he takes over, they institute pat-downs of everybody, not just people wearing kimars or headgear or whatever, everybody going through those checkpoints. So now where's your undue burden? Because you're now patting down absolutely everybody going through those checkpoints. So, again, these are all factual matters. You don't have to resolve them. That's why we're asking that this case be reversed and remanded for a trier of fact to do what it should have been allowed to do in the first instance. Okay. Thank you. Thank you. Do you have – wait a minute. Do you have any questions? No. No. Okay. Okay. We will take the matter under advisement, and we will get the disk to Judge Roth as soon as she's able to review it. Can't do more than that. Right.